Melissa Escobar
_____
NAME

WE4437
_____
PRISON IDENTIFICATION/BOOKING NO.

California Institution for Women
_____
ADDRESS OR PLACE OF CONFINEMENT

16756 Chino-Corona Road, Corona, CA 92880
_____
Note:    It is your responsibility to notify the Clerk of Court in writing of any
         change of address. If represented by an attorney, provide his or her
         name, address, telephone and facsimile numbers, and e-mail address.

FILED

feb Due     2019 OCT 16  PM 5:44

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Melissa Escobar
_____
FULL NAME (*Include name under which you were convicted*)

                                    Petitioner,

v.

Molly Hill, Warden California Institution for Women
_____
NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

                                    Respondent.

CASE NUMBER:

**CV19-8925-FMO (AFM)**

To be supplied by the Clerk of the United States District Court

☐ _____ **AMENDED**

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
### 28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION  Los Angeles
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(*List by case number* )
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.    To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.    In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.    Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.    Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.    You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.    You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.    When you have completed the form, send the original and two copies to the following address:

        Clerk of the United States District Court for the Central District of California
        United States Courthouse
        ATTN: Intake/Docket Section
        255 East Temple Street, Suite TS-134
        Los Angeles, California 90012



LODGED
CLERK, U.S. DISTRICT COURT

OCT 11 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue

   a. Place of detention __California Institution for Women (CIW)__

   b. Place of conviction and sentence __Michael Antonovich Antelope Valley Courthouse, Department A16,__
   __42011 4th Street, West Lancaster, CA 93534__

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).

   a. Nature of offenses involved (*include all counts*) : __First Degree Murder__

   b. Penal or other code section or sections: __187__

   c. Case number: __Trial Case No.: MA052889__

   d. Date of conviction: __Jury Verdict 10/2/2014__

   e. Date of sentence: __November 17, 2014__

   f. Length of sentence on each count: __Twenty five years to life__

   g. Plea (*check one*):

      ☒ Not guilty

      ☐ Guilty

      ☐ Nolo contendere

   h. Kind of trial (*check one*):

      ☒ Jury

      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☒ Yes  ☐ No

   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):

   a. Case number: __B260324__

   b. Grounds raised (*list each*):

      (1) __The murder conviction is not supported by substantial evidence because there is no proof__ (cont. see attached)

      (2) __Presenting Perez to the jury for the sole purpose of demonstrating his refusal to testify was__ (cont. see attached)

(3) The trial court erred by failing to instruct that Appellant was guilty only of the lesser offense  (cont. see attached)

(4) _____

(5) _____

(6) _____

c.  Date of decision:    10/21/2016

d.  Result    Judgment was affirmed

_____

4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☒Yes  ☐No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a.  Case number: S238720

b.  Grounds raised *(list each)*:

(1) The murder conviction is not supported by substantial evidence because there was no proof (cont. see att.)

(2) Presenting Perez to the jury for the sole purpose of demonstrating his refusal to testify was (cont. see att.)

(3) The trial court deprived appellant of her 14th Amendment right to due process and her (cont. see att.)

(4) _____

(5) _____

(6) _____

c.  Date of decision:    1/11/2017

d.  Result    Petition Denied

_____

5.  If you did not appeal:

a.  State your reasons _____

_____

_____

_____

b.  Did you seek permission to file a late appeal?    ☐Yes  ☐No

6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☒Yes  ☐No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court:  Superior Court County of Los Angeles, State of California

(2) Case number:  MA052889

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:    September 21, 2017

3.

    b. Grounds raised (cont.)

Grounds Raised on Appeal:

(1.)    that appellant aided and abetted Perez to commit any lethal act.

(2.)    irrelevant and prejudicial and violated appellant's 6th and 14th amendment rights.

(3.)    of voluntary manslaughter if the jury had a reasonable doubt that Perez used lethal force as the result of a sudden quarrel or heat of passion on adequate provocation or had a reasonable doubt that Perez had a genuine but unreasonable belief in the necessity to use lethal force in self-defense.

4.

    b. Grounds raised (cont.)

Grounds Raised Supreme Court:

(1.)    appellant aided and abetted Perez to commit any lethal act.

(2.)    irrelevant and prejudicial and violated Appellant's 6th and 14th Amendment Rights.

(3.)    6th Amendment Right to present a defense by failing to instruct that Appellant was guilty only of the lesser offense of voluntary manslaughter.

(4) Grounds raised *(list each)*:

    (a)  This Petition alleges that new evidence reveals that Petitioner did not aid and (cont. see attachment)

    (b)  The newly discovered evidence demonstrates Petitioner is actually innocent of the crime of murder.

    (c)  This Petition alleges that the government improperly called co-defendant as a witness to (cont. see att.)

    (d)  This Petition alleges that the government introduced the prior statements of Ryan Perez (cont. see att.)

    (e)  This Petition alleges that the government introduced the prior statements of Mario Pinon (cont. see att.)

    (f)  This Petition alleges that Petitioner was denied her right to due process, a fair trial, and (cont. see att.)

                                      (See attached additional Grounds Raised)

(5) Date of decision:  6/13/2018

(6) Result  Denied

(7) Was an evidentiary hearing held?  ☐ Yes  ☒ No

---

b.  (1) Name of court:  Court of Appeal, State of California, Second Appellate District , Division One

    (2) Case number:  B291287

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:  July 13, 2018

    (4) Grounds raised *(list each)*:

        (a)  New evidence in the form of a voluntary statement from the actual killer Ryan Perez (cont. see att.)

        (b)  The newly discovered evidence shows that petitioner is actually innocent and being  (cont. see att.)

        (c)  Putting Perez on the stand to invoke his Fifth Amendment right to remain silent    (cont. see att.)

        (d)  Admission of Perez's prior statements to police when Perez was unavailable as a    (cont. see att.)

        (e)  Admission of Mario Pinon's prior testimony, despite the government's lack of due    (cont. see att.)

        (f)  Failure to instruct on lesser-included offenses and defenses violated petitioner's    (cont. see att.)

    (5) Date of decision:  12/5/2018          (See attached additional Grounds Raised)

    (6) Result  Petition Denied

    (7) Was an evidentiary hearing held?  ☐ Yes  ☒ No

---

c.  (1) Name of court:  California Supreme Court

    (2) Case number:  S253864

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:  2/1/2019

    (4) Grounds raised *(list each)*:

        (a)  This Petition alleges that new evidence reveals that Petitioner did not aid and (cont. see attachment)

        (b)  The newly discovered evidence demonstrates Petitioner is actually innocent of the crime of murder.

        (c)  This Petition alleges that the government improperly called co-defendant as a witness to (cont. see att.)

        (d)  This Petition alleges that the government introduced the prior statements of Ryan Perez (cont. see att.)

        (e)  This Petition alleges that the government introduced the prior statements of Mario Pinon (cont. see att.)

        (f)  This Petition alleges that Petitioner was denied her right to due process, a fair trial, and (cont. see att.)

                                    (See attached additional Grounds Raised)

6.

(4)     Grounds Raised (cont.)

(a)     abet Ryan Perez when he killed Villa; had that evidence been available to Petitioner's trial counsel and admitted before the jury, it is probable the verdict would have been different.

(b)

(c)     testify in front of the jury knowing that he would invoke his right to remain silent under the Fifth Amendment, thereby denying Petitioner the right to a fair trial, due 'process, and right to effective assistance of counsel.

(d)     in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, right to fair trial, right to due process, and right to effective assistance of counsel.

(e)     in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, right to fair trial, right to due process, and right to effective assistance of counsel.

(f)     right to jury trial when the lower court failed to comply with its sua sponte obligation to instruct on lesser included offenses.

(g)     This Petition alleges that Petitioner was denied the ability to present evidence of Villa's gang affiliation in violation of her right to present evidence, right to due process, right to a fair trial, and right to effective representation of counsel.

(h)     The government committed numerous instances of misconduct, violating Petitioner's rights to due process, a fair trial, and trial by an impartial jury.

(i)     This Petition alleges that Petitioner's trial counsel was ineffective in preparing for trial and during the trial, such that petitioner was denied her rights to due process, to a fair trial, and to effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 7, 15, and 16 of the California Constitution.

(j)     This Petition alleges that Petitioner's appellate counsel was ineffective such that petitioner was denied her rights to due process, to a fair trial, and effective assistance of counsel in violation of her rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 7, 15, and 16 of the California Constitution.

(k)     This Petition alleges that the cumulative effect of the errors detailed above so infected the trial with unfairness as to require reversal of petitioner's conviction.

6.

b.

(4) Grounds Raised (cont.)

(a)    completely undermines the government's case and would have resulted in a more favorable result for Petitioner had it been available at trial.

(b)    in prison for a crime she did not commit.

(c)    prejudiced the jury and constitutes a gross violation of petitioner's constitutional rights.

(d)    witness violated petitioner's constitutional rights.

(e)    diligence in procuring Pinon, violated petitioner's constitutional rights.

(f)    constitutional rights.

(g)    Exclusion of relevant evidence of the victim's prior gang affiliation prevented petitioner .... from presenting her defense theories and violated her constitutional rights.

(h)    The government committed misconduct and violated petitioner's constitutional rights when it misused forensic evidence, lowered its burden of proof, and misstated the law of aiding and abetting.

(i)    Trial counsel was ineffective and violated petitioner's constitutional rights in failing to present crucial evidence and to object to several inadmissible and prejudicial   pieces of evidence.

(j)    Appellate counsel was ineffective and violated petitioner's constitutional rights in failing to raise meritorious claims and failing to cite to the correct law or to pertinent facts from the record.

(k)    The cumulative effect of the errors detailed above so infected the trial with unfairness as to require reversal of petitioner's conviction.

6.

c.

(4) Grounds Raised (cont.)

(a)   abet Ryan Perez when he killed Villa; had that evidence been available to Petitioner's trial counsel and admitted before the jury, it is probable the verdict would have been different.

(b)

(c)   testify in front of the jury knowing that he would invoke his right to remain silent under the Fifth Amendment, thereby denying Petitioner the right to a fair trial, due process, and right to effective assistance of counsel.

(d)   in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, right to fair trial, right to due process, and right to effective assistance of counsel.

(e)   in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, right to fair trial, right to due process, and right to effective assistance of counsel.

(f)    right to jury trial when the lower court failed to comply with its sua sponte obligation to instruct on lesser included offenses.

(g)   This Petition alleges that Petitioner was denied the ability to present evidence of Villa's gang affiliation in violation of her right to present evidence, right to due process, right to a fair trial, and right to effective representation of counsel.

(h)   The government committed numerous instances of misconduct, violating Petitioner's rights to due process, a fair trial, and trial by an impartial jury.

(i)   This Petition alleges that Petitioner's trial counsel was ineffective in preparing for trial and during the trial, such that petitioner was denied her rights to due process, to a fair trial, and to effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 7, 15, and 16 of the California Constitution.

(j)   This Petition alleges that Petitioner's appellate counsel was ineffective such that petitioner was denied her rights to due process, to a fair trial, and effective assistance of counsel in violation of her rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 7, 15, and 16 of the California Constitution.

(k)   This Petition alleges that the cumulative effect of the errors detailed above so infected the trial with unfairness as to require reversal of petitioner's conviction.

(5) Date of decision:   6/12/2019

(6) Result   Petition denied

(7) Was an evidentiary hearing held?   ☐ Yes  ☒ No

7.  Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☒ No

   If yes, answer the following:

   (1) Docket or case number (if you know):

   (2) Result:

   (3) Date of result (if you know):

   (4) Citation to the case (if you know):

8.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than five grounds.  Summarize briefly the facts supporting each ground.  For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

   **CAUTION:**   *Exhaustion Requirement*:  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court.  This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

   a.  Ground one:   This Petition alleges that new evidence reveals that Petitioner did not aid and abet Ryan Perez when he killed Miguel Villa; had the new evidece been available to Petitioner's trial counsel and (cont. see att.)

      (1) Supporting FACTS:   Ryan Perez and Petitioner were tried in a joint trial In February 2012. In that trial, Perez did not testify. After Petitioner's case was reversed on appeal, she was retried alone. While Perez was still pursuing a collateral appeal, he was called to testify at Petitioner's retrial and exercised his Fifth Amendment right against self-Incrimination, discussed In Ground III. (3RT 1838:4-26.) After Perez's collateral appeals were exhausted, he agreed to give a statement to an investigator for (cont. see att.)

      (2) Did you raise this claim on direct appeal to the California Court of Appeal?   ☐ Yes  ☒ No

      (3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☐ Yes  ☒ No

      (4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☒ Yes  ☐ No

   b.  Ground two:   The newly discovered evidence demonstrates Petitioner is actually innocent of the crime of murder.

      (1) Supporting FACTS:   The relevant facts from the new evidence are detailed above in Ground I and incorporated herein by reference. Perez's powerful admission of the events that transpired in the early

morning hours of April 19, 2011, when considered next to the speculative nature of the government's case, shows that Petitioner is actually innocent of the murder of Villa.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☒ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

c.  Ground three:  This Petition alleges that the government improperly called co-defendant as a witness to testify in front of the jury knowing that he would invoke his right to remain silent under the (cont. see att.)

(1) Supporting FACTS:  The government called Perez to testify at Petitioner's retrial, claiming that he no longer had a Fifth Amendment right. (3RT 1804:17-21. Before trial, the prosecutor knew Perez asserted that he was still pursuing his appellate remedies and would not testify. In arguing why it should be able to put Perez on the stand to invoke his Fifth Amendment rights, , the government plainly admitted that "my argument is certainly going to be exactly what I think [defense counsel] is afraid of (cont. see att.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒ Yes  ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

d.  Ground four:  This Petition alleges that the government introduced the prior statements of Ryan Perez in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, (cont. see att.)

(1) Supporting FACTS:  At the first trial, the government filed a motion In limine which included a request to admit statements Perez made to investigators. arguing. inter alia. they were admissions by a party opponent. Perez's statements were admitted. At Petitioner's retrial. the government filed a motion asking that all motions in limine from the first trial remain in effect. Petitioner's counsel offered no objection to the government's motion on that issue. When Perez was on the stand during the retrial, (cont. see att.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☒ Yes  ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☒ Yes  ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

e.  Ground five:  This Petition alleges that the government introduced the prior statements of Mario Pinon in violation of Petitioner's Sixth Amendment rights to confront and cross-examine witnesses, (cont. see att.)

(1) Supporting FACTS:  In Petitioner's first trial, Pinon testified as a witness for the prosecution concerning his knowledge of the supposed encounter between Villa and Perez in front of VIlia's house, the purported motive for murder. The government failed to even begin to search for Pinon until after all parties had announced "ready" for trial. (2RT 625:20-25.) The investigator then conducted a rote "search" of Pinon's

(SEE ADDITIONAL GROUNDS AND FACTS ATTACHED)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No

Supporting facts

8.

a. Ground one: (cont.)

admitted before the jury, it is probable the verdict would have been different.

(1) Supporting FACTS: (cont.)

for Petitioner, which is attached to this Petition as Exhibit A. Perez told the investigator that he and
Petitioner were in a romantic relationship until his arrest in 2011. Perez had previously seen Petitioner
and the victim, Miguel Villa, together several times, but was uncertain about the nature of their
relationship. Perez became jealous when Villa called Petitioner, and on one occasion answered her
phone and told Villa, "Don't call this number again, bitch." (2RT 962: 13-21; Exhibit A) Perez began to
accuse Petitioner of having feelings for Villa. (8RT 3350:23-28; 3351: 1-5.) Perez describes the events
that took place on April 18, 2011 and "recalls getting into a fight with Escobar ... the two of them broke up
during a phone call. The phone call was followed by argumentative text messages." (Exhibit A.) Later that
night, Perez drove to Petitioner's house and waited outside. When he saw Petitioner get in her car to
leave, he became suspicious and followed her-first to Villa's house, then to the location where Villa was
killed. (Exhibit A.) Perez recounts that he (not Petitioner, as the government alleged) called Villa from his
phone, and that the phone connected "but no one answered the call." (Exhibit A.) Perez stated that he
placed the call on speaker and listened for 5-10 minutes, trying to see if he could hear Petitioner and Villa
talking. (Exhibit A.) Wanting to "catch them red handed," Perez followed Petitioner's car to the clearing in
Forest Falls where he exited his vehicle and confronted Petitioner and Villa. Perez then detailed the
physical altercation that resulted in Villa's death: "He recalls that Villa produced a knife which had an
approximate 3 1/2-4" blade. (¶ Perez went to the trunk of his car and obtained a baseball bat. (¶ Perez
stated that he does not remember much of what followed. He does recall that Escobar was 'panicked' and
was crying. She repeatedly yelled, 'Stop!' (¶ Perez recalls striking Villa and seeing him on the ground.
Villa appeared dead. (¶ Perez admits placing Villa's cell phone in the attic of his garage. He does not
know why he did, explaining only that at the time he was 'devastated.'" (Exhibit A.) Perez now states:
"Escobar had no knowledge that the events which unfolded were about to occur." (Exhibit A.)

c. Ground Three: (cont.)
Fifth Amendment, thereby denying Petitioner 'the right to a fair trial, due 'process, and right to effective
assistance of counsel.

(3) Supporting FACTS: (cont.)
which ls that I'm going to say, 'Look, his conviction is over with, and If his girlfriend were innocent, he
could come up here and tell you that.'" (3RT 1808:1-6.) The trial court found Perez should be placed in
front of the jury to "see what he says." (3RT 1811 :10-13.) Perez was then called to testify before the jury
and Immediately invoked the Fifth Amendment. 3RT 1838-1839; 1843:1-7.)
The prosecutor then told Perez that he would grant him immunity. (3 RT 1846: 3-7.) After Perez
still refused to talk, the prosecutor stated, in front of the jury, "[Y]our honor, I am going to extend statutory
immunity to this witness." (3RT 1846:11-12.) The government then took none of the steps required to
have the court confer immunity, instead he stated: "I, Ryan Williams, Deputy District Attorney III, grant
statutory immunity under Penal Code §1324 to Ryan Perez].)" (1CT 85, italics added .. ) When Perez
was confused and unresponsive, the prosecutor then went even further, stating, in the jury's presence,
"I'm a representative of the office. I've been a D.A. for many, many years," counsel showed the witness
his "credentials," and then actually flashed his "badge" to the witness. (3RT 1890:2-4.) Using the authority
of his "credentials" and "badge," the prosecutor told Perez: "I am telling you that we are Immunizing you
for this testimony." (3RT 1890:4-6.) Perez stated, "I don't know what to say. I don't know what to do[.]
I just got appointed a lawyer, but I haven't had the - - anyone to tell me how to go through with this."
(3RT 1889:8-11.) Still in front of the jury, the prosecutor responded, "[L]et me help you out ... I want
the truth. Give me the truth ... Tell me the truth. Just say the truth." (3RT 1889:14-20.) Perez then
responded, "I plead the Fifth." {3RT 1889:21.) Perez answered a few non-substantive questions.

d.  Ground Four: (cont.)
right to fair trial, right to due process, and right to effective assistance of counsel.

(4) Supporting FACTS: (cont.)
he was asked no questions about the specific statements he made to police. The government then called Detective Valento to the stand and played portions of an audio tape of Perez being interviewed by police officers, without further discussion of admissibility. (5RT 3079:8-15: 2CT 314-346.) In closing, the government again played parts of Perez's taped interview to show that he "admitted" to a prior dispute with Villa. (7RT 4207:28-4208:2.)

e.  Ground Five: (cont.)
right to fair trial, right to due process, and right to effective assistance of counsel.

(5) Supporting FACTS: (cont.)
name, located three possible addresses, and stopped searching after a single attempt at the locations. The Investigator called Pinon's cell phone; a man claiming to be Pinon answered, stated he was transient, living in another state, and would not testify. (2RT 619:4-27.) The government conducted no further investigation. There was no evidence that anyone asked Pinon's wife-a prosecution witness who testified at both trials-where Pinon was or checked the separate address where Pinon testified at the first trial that he received government checks. (2RT 956:4-12; 1206; A1, 3RT 963.) No one checked for an address associated with Pinon's cell phone or checked any of the other relevant agencies (local jails, phone companies, the gas company, the Department of Water and Power, voter registration, unions, Social Security, welfare agencies, etc.).

f.  Ground Six:
This Petition alleges that Petitioner was denied her right to due process, a fair trial, and right to jury trial when the lower court failed to comply with its sua sponte obligation to instruct on lesser included offenses.

(6) Supporting FACTS:
Petitioner was charged In both trials with one count of first-degree murder. (6RT 3967:11-16; A 1, 1CT 152.) At both trials, Petitioner provided the only eye-witness testimony of the killing. (See 6RT 3371-3602, 3617-3637; A1, 7RT 3054-3079.) Petitioner described a highly intense, emotionally wrought situation, which resulted In Villa's death. Petitioner testified concerning the recent contentious break-up with Perez, 6RT 3362-3365; that, while she was with Villa, Perez "came out of nowhere" and said, "You should have told me, you should have told me," 6RT 3375:18-22; that Villa pulled a knife from his pocket, 6RT 3378-3379; and, that, as Villa moved closer, Perez swung a bat and hit Villa in the head, 6RT 3617-3619. Petitioner referred to Perez's actions as "self-defense." (6RT 3702:3-10.) At the first trial, the jury was Instructed on voluntary manslaughter and self-defense. (A1, 2C I 32 7-334.) At the second trial, the parties seemed to be under the misconception that the court could not Instruct on lesser-included offenses or defenses that Involved Perez-i.e. self-defense, heat of passion manslaughter, Imperfect self-defense-because Perez had already been convicted of first-degree murder. (6RT 3965:28; 3966; 3967:1-4.) Indeed, It was Petitioner's trial counsel who first raised that argument. Thus, the jury was not instructed on any lesser-included offenses, including voluntary manslaughter (CALCRIM No. 570), self-defense (CALCRIM No. 505), or Imperfect self-defense (CALCRIM No. 571). In the first trial, the trial court had no reluctance instructing the Jury on the lesser-included offenses and relevant defenses. The evidence in the first and second trial (as it related to heat of passion and self-defense) was the same; yet, the court refused to issue those instructions. (See 6RT 3693:20-28; 3694:1-3.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?                    ☒ Yes  [ ] No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?        ☒ Yes  [ ] No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?              ☒ Yes  [ ] No

g. Ground Seven:

This Petition alleges that Petitioner was denied the ability to present evidence of Villa's gang affiliation in violation of her right to present evidence, right to due process, right to a fair trial, and right to effective representation of counsel.

    (7) Supporting FACTS:

The victim in the instant case was a Florencia 13 gang member. Because of his gang activity, Villa was shot in the neck in 2002. Conversely, the government candidly admitted there was no evidence that Petitioner had ever been a gang member. (2RT 608:17-19.) Yet, the government wanted to use Petitioner's friendship with Villa to argue that she was a "wannabe" Florencia 13. The government sought to present the testimony of a gang expert to opine that gang members (and presumably "wannabe" gang members) engage In acts of retaliation when they are disrespected, and that Petitioner was "disrespected" when Perez stayed In her car after Villa told him to "get out."

The court ruled that the government could not bring in "gang culture" evidence against Petitioner (who was not a gang member); the court then determined that If the defense argued about Villa's gang affiliation, the defense would be "opening the door . . . regarding the gang affiliations, [making] the People . . . entitled to ask [Petitioner] about her personal gang affiliations or her desire to be a member of a gang." Evidence of Villa's gang membership would have demonstrated why Villa came at Perez with a knife and why the use of deadly force against Villa appeared necessary. Additionally, Petitioner sought to explain that her reason for not Informing law enforcement about Villa's death was her fear of retribution because of Villa's gang affiliation. (A1, 6RT 2402:7-10.) Yet, the defense was faced with the choice of enduring a punishment-the Introduction of unfounded, irrelevant, and prejudicial evidence-if Petitioner exercised her right to present relevant, well-founded evidence of Villa's gang membership.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    [] Yes    [X] No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    [] Yes    [X] No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    [X] Yes    [] No

h. Ground Eight:

The government committed numerous instances of misconduct, violating Petitioner's rights to due process, a fair trial, and trial by an impartial jury.

    (8). Supporting FACTS:

The government committed misconduct in several ways:

1) At trial. the prosecution called criminalist Richon Tate. (4RT 2403:18-28: 2404:1-12.) Tate had samples of DNA from Escobar. Perez. and the victim Villa to compare with the DNA taken from Villa's cell phone battery. (4RT 2426:18-27.) The sample from the cell phone battery allowed an evaluation of two loci. which the expert stated were "the only ones I can add the statistical weight to from a scientific standpoint." (4RT 2435:17-25: 2436:11-19.) Tate compared the samples from the cell phone battery and determined that Perez and Petitioner could not be conclusively excluded as contributors to the DNA. (See 4RT 2435: 19-22.) Tate then explained the random match probability was 1 out of 1. 1; thus, 10 out of every 11 people could not be excluded. (4RT 2435:23-24; 2440:11-13.) In closing argument, the prosecutor Instructed the jury to disregard that fact. stating Its own expert's findings were "garbage evidence, [that] doesn't show us anything." (7RT 4229:6-7.) Instead, the prosecutor lined up two DNA exhibits for the jury and Instructed the jury to draw Its own conclusions. stating, "you don't need to be a scientist to figure this out." (7RT 4229:13-16.) The prosecutor then told the jury to "look at [Petitioner's) numbers here on the left and compared them to the numbers on the cell phone battery on the right." (7RT 4228:11-14. 4229:14-16.) The prosecutor stated the jury could look at all the loci, not just the two considered by the expert. and that when "you look at her numbers here on the left and compare them to the numbers on the cell phone battery on the right. her numbers are all over this cell phone battery." (7RT 4229:13-16. emphasis added: see also 7RT 4229:17-26.) The government repeatedly argued in closing that it had conclusively shown the Petitioner's DNA was on the cell phone battery; "The cell phone battery has DNA on it from her Petitioner." and Petitioner's "DNA is on the cell phone battery." (7RT 4228:4-7. emphasis added.) The value the government put on its fictitious evidence cannot be

understated: the government used the "evidence" that Petitioner's DNA was on the cell phone battery to argue that "[s]he Is guilty. If she's not part of this plan. why does she need to t9uch the battery?" (7RT 4230:7.)

2) For both trials. the government had the same evidence: that Petitioner and Perez. like every 10 out of every 11 people could not be excluded as contributors to the DNA found in VIIia's cell phone battery. (4RT 2440:11-13: A1. 5RT 1914:2-8.) At the first trial. the government did the exact same comparison-lining up two DNA exhibits-but changed its argument to state that the jury could do the same number comparison to now prove that Perez was the one with DNA "all over" the battery: "Every single location on Ryan Perez's DNA is all over on that phone." The government then concluded, "There is no way you can look at this and say he's not the person who touched that battery. Of course, he is. There's no excuse for why his DNA would be on that battery." (Al, 9RT 3625:12-15.) As noted above, the government argued the opposite conclusion (that it was Petitioner's DNA *all over the battery)* in the second trial.

3) Government expert, Dr. Wang, testified that several of the injuries to Villa were inflicted by a blunt force object but not any specific instrument. Yet, during closing argument, the government argued that it had conclusively proven some injuries were *"absolutely [caused by] brass knuckles,"* stating Villa "was beaten to death with blunt weapons . . . *One of them is brass knuckles."* (7RT 4222:5-20, emphasis added.) Although no brass knuckles were ever found or forensically linked to the killing of Villa, the government told the jury that if brass knuckles caused some of Villa's injuries, Petitioner must have been involved in the killing: "They [the defense], know if brass knuckles [were used], she had to have something to do with it. She's the one who had the brass knuckles. She used them or gave them to Ryan. If they're brass knuckles, she's part of it." (7RT 4222:10-13.)

4) In closing argument, the government repeatedly misstated the requirement of intent for aiding and abetting, stating, "In plain English, if two people commit a crime together, they're both guilty of that crime." (7RT 4233:25-26.) The government described its burden as only requiring the following: "First, we have to prove that Ryan Perez murdered Miguel Villa. [Then,] [w]e have to prove Melissa Escobar knew about it and helped him do that." (7RT 4235:2-4.)

5) The prosecutor also lowered its burden of proof by attempting to explain the meaning of reasonable doubt, arguing, "What does that [reasonable doubt] mean? . . . ¶'Yeah, I guess it's possible it could have happened some other way, but I'm convinced this is how it happened.'" (7RT 4231:15-19.) The prosecutor continued, "So, the touchstone, the thing you care about is what is reasonable, what is the reasonable explanation[.] A good way to think about it . . . what is the only reasonable explanation that fits all of the facts?" (7RT 4232:2-10.) The prosecutor further employed a misleading aid to explain reasonable doubt: "I have a little brother. And when I was young we were both young, we used to play this game called "what is it?" . . . . I would think of something and give my little brother clues and see how many clues it took before he would guess what I was thinking about. So I want you to imagine you and I are playing what is it? 'I am thinking of something. It's an animal; gray, big ears, a long nose. It has tusks. It weighs a ton. It likes peanuts, and you can see it in the circus.' at this point, all of you know what animal I'm thinking of. You all know I'm thinking of an elephant." (7RT 4232:14-25.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     [ ] Yes   [X] No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   [ ] Yes   [X] No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   [X] Yes   [ ] No


i.  Ground Nine:
This Petition alleges that Petitioner's trial counsel was ineffective in preparing for trial and during the trial, such that petitioner was denied her rights to due process, to a fair trial, and to effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 7, 15, and 16 of the California Constitution.

    (9) Supporting FACTS:
Trial counsel has provided a letter, attached as Exhibit B, In which he recognizes that an unfortunate, unforeseen event occurred during the trial which likely prevented counsel from effectively representing Petitioner. Additionally, the record shows that trial counsel was Ineffective in falling to fully investigate and provide expert testimony to challenge the government's arguments that Villa's wounds must have been

made by brass knuckles. (7RT 4222:19-20.) The government relied heavily on the fact that it had proved brass knuckles were used to "connect" Petitioner to the killing of Villa. (7RT 4245:5-6.) Although defense counsel knew the government would make this argument, because the government used the same unsupported argument In the first trial, defense counsel conducted no investigation Into whether it was an appropriate conclusion and offered no evidence to counter this assertion. Had trial counsel obtained an expert versed In forensic pathology and the pathology of trauma, as Petitioner has now done, that expert could have testified that It proved that brass knuckles were used was baseless. (See report attached as Exhibit C.) Additionally counsel did not investigate or present an expert to counter the Government's DNA argument.

Additionally, as discussed in Claim VI, the jury at the retrial was not instructed on the lesser-include offenses or defenses. In determining that those defenses no longer applied, it was defense counsel who first argued that because a separate jury had found that Perez did not act in self-defense, Imperfect self-defense, or under heat of passion, then somehow this jury could not reach a different conclusion. (6RT 3965-3967.) Trial counsel's assumption that any defenses "that had to do with Mr. Perez" were inapplicable at the retrial constituted deficient representation, and the argument foreclosed the court from providing legitimate and persuasive Instructions to the jury on lesser-Included offenses and defenses. (6RT 3966:1-4.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     [ ] Yes  [X] No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  [ ] Yes  [X] No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   [X] Yes  [ ] No


j.  Ground Ten:

This Petition alleges that Petitioner's appellate counsel was ineffective such that petitioner was denied her rights to due process, to a fair trial, and effective assistance of counsel in violation of her rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections ·7, 15, and 16 of the California Constitution.

(10) Supporting FACTS:

In the Appellant's Opening Brief. appellate counsel argued that the act of calling Perez to invoke his Fifth Amendment rights in front of the jury violated Petitioner's rights in the manner addressed In Bruton v. United States (1968) 391 U.S. 123 (Bruton) and Crawford. Respondent then filed Its brief, pointing out that Bruton and Crawford were not the correct legal precedent to support Petitioner's argument about bringing Perez in front of the jury. Appellate counsel then failed to file a reply brief addressing this issue and waived oral argument. thereby foreclosing any clarification or hope of rehabilitating the legal presentation of these Issues. Appellate counsel raised an important Issue. the government's act of bringing Perez to the stand to exercise his Fifth Amendment rights, but failed to set forth the appropriate law, factual background. and analysis to establish error to Petitioner. In denying Petitioner's appeal, the Court of Appeal's found: "we note that defendant's reliance on Bruton and Crawford Is misplaced. Neither an extrajudicial statement by Perez Implicating defendant nor testimonial hearsay was Introduced." Furthermore. appellate counsel omitted serious and significant concerns that arose during Petitioner's retrial and are manifest in the record. For example. the argument that the government, over defense objection, mischaracterized or fabricated the DNA evidence with respect to Villa's cell phone battery, set forth In Claim VIII, was an Issue for appeal should have been raised. (See 7RT, 4229:13-19.)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     [ ] Yes  [X] No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  [ ] Yes  [X] No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?   [X] Yes  [ ] No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

9.  If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons:  <u>Claims based on new evidence or</u>  <u>arguments.</u>

10.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes  ☒ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

(7) Was an evidentiary hearing held?  ☐ Yes  ☒ No

b.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes ☒ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes    ☒ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes ☒ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on *09-18-2019*                    _____
          *Date*                                         *Signature of Petitioner*

# EXHIBIT A



23638 Lyons Avenue, # 167
Newhall, CA 91321
661.476.2325
pi@overwatchassets.com
CA PI License 28345

**DATE:**        7/8/17

**TO:**          Elizabeth Little, Esq.

**CASE:**        Melissa Escobar

**WITNESS:**     Ryan Perez
                 CDC# AL2861
                 Pleasant Valley State Correctional Facility
                 Coalinga, CA.

**DATE OF INTERVIEW:** 7/6/17

**TIME OF INTERVIEW:** 1120 hours

On the above date and time, Private Investigator Stanley Cochran (PI), Overwatch Assets Investigations, CA PI 28345, interviewed Ryan Perez within the California State Correctional Facility where he is housed. Prior to the interview, Perez informed PI that he was not currently represented by legal counsel. Perez agreed to be interviewed. PI informed Perez that he was working on behalf of Melissa Escobar. The interview was not recorded.

Perez stated that he has known Melissa Escobar since approximately 2010. He met her through family connections, as Perez' sister, Brooke Perez, was engaged to Escobar's brother, Ben Escobar. Initially, he and Escobar saw each other infrequently while attending family functions.

At some point, perhaps months later, Perez and Escobar became involved in a romantic relationship. They had contact at least every day, sometimes by phone. Their relationship was sexual. Escobar lived with her parents in Redlands.[1] Perez lived with his parents also, on Mesquite Street in either Highland, or San Bernardino, CA.

The relationship lasted until Perez's arrest in 2011.

Perez has known Miguel Villa since 2010, meeting him when he (Villa) had given a tattoo to Perez' sister.

---

[1] Ben and Lully Escobar.

1

At some point, Perez moved with his parents to a home located at 3124 N. F. Street, San Bernardino. Several times, Escobar and Villa came to the house together. Perez did not know the nature of the relationship between Villa and Escobar. When he saw the two of them together, he did not know they had ever been in a prior relationship. Perez asked Escobar a number of times, but Escobar denied that she and Villa had ever been romantically involved.

Perez did not find out that Escobar and Villa had been in a relationship until after his arrest for the murder of Villa.

Perez felt that he and Villa got along well with each other.

At some point, Perez recalls Villa calling Escobar's cell phone. Perez answered. Villa asked to speak to Escobar. Perez told Villa, "Don't call this number again, bitch!" Perez explained that he did not want Villa calling and speaking to Escobar, his girlfriend. Villa made some kind of smart remark in response, but Perez cannot remember specifically what it was.

Although he cannot remember the date or time frame, Perez remembers being with Escobar when she drove to Villa's home to obtain some belongings. The home was in Highland, as he recalls. Perez remained in the car, while Escobar got out and contacted Villa.

From his seated position in the car, Perez could see that Villa seemed upset at Escobar. He does not know why. Escobar and Villa were standing approximately 15 feet away from Escobar's car. Perez could see them talking, but he could not hear what they were saying. He had no idea why Villa seemed angry.

Perez was asked if words were exchanged between Villa and him. Perez replied that he was "cloudy" and cannot remember if he and Villa spoke. Perez saw no one else at the scene when this occurred.

At the time of these events, Escobar had a one year old child named "Isaac." The father of the child was Jose Medina. Perez and Medina were on good terms with each other.

On April 18, Perez recalls getting into a fight with Escobar. He can't remember what started it, but the two of them broke up during a phone call. The phone call was followed by argumentative text messages back and forth between Escobar and Perez. He cannot remember his phone number at the time, Escobar's phone number, or his cell phone carrier.

Perez cannot remember what else he did on the 18th. Perez cannot remember if he was with anyone else that evening. He cannot remember whether or not he was at Escobar's house.

Perez stated he was not at Escobar's house when Jose Medina picked up Isaac on the night of April 18, 2011.

Perez cannot remember why he and Escobar broke up. He cannot remember if the reason for the break up had anything to do with Villa.  Perez had broken up with Escobar on prior occasions.

Perez did not talk with Villa on the phone on April 19. Perez does not  remember calling Villa. Perez does not recall ever setting his cell phone to block his caller ID.

Perez cannot remember the last time he saw Escobar, either on April 18 or April 19.

Perez stated he was not with anyone on April 18, 2011. He believes he was at home, but he is not sure.

Late on the night of April 18, 2011, Perez drove to Escobar's home. As he approached the cul-de-sac where she lived, he observed her driving away from her home. Escobar was driving a beige or gray Infinity. He became suspicious of her, so he decided to follow.

As he followed Escobar, he noted that she was driving in the direction of Villa's house. He became increasingly suspicious that she may be going to see him, so he continued following.  At some point, Perez called either Escobar or Villa from his cell phone. A connection  was made, but no one answered the call.  Perez stated, "It was like someone butt answered the call." He placed the call on speaker and listened for 5-10 minutes. He could hear only muffles. Perez admits that he was upset at this point.

As he neared the area of Villa's house, he parked in front of a nearby Wallmart, from whence he could observe Escobar as she left Villa's house.

Perez does not believe that Escobar had any idea she was being followed.

After approximately 5-10 minutes of waiting, Perez observed Escobar's car leave the area of Villa's home. He again began following.  He noted after a period of time following Escobar that she was driving in the direction of "Forrest Falls," a remote location he and Escobar had visited together approximately 15 times prior.  Perez and Escobar routinely visited the location in the past in order to have privacy while being intimate.

When he arrived at the turn-out area they had often visited, he observed Escobar's car parked. Escobar and Villa were out of the car. Perez pulled his own car directly up next to Escobar's.

Perez got out of his car. He admits that he was "angry and enraged" as he confronted Escobar and Villa. He was arguing with both of them.

From that point on, Perez stated that his memory of the events is "mushed together." He recalls that Villa produced a knife which had an approximate 3 1/2-4" blade.

Perez went to the trunk of his car and obtained a baseball bat. Perez explained that he had other items of athletic equipment in the trunk of his car, including a baseball glove and soccer equipment. Perez stated that he had played baseball and softball earlier in the year with his cousins, Curtis and Kyle Henley, at a church baseball field near Highland.

3

Perez stated that he does not remember much of what followed. He does recall that Escobar was "panicked" and was crying. She repeatedly yelled, "Stop!"

Perez recalls striking Villa and seeing him on the ground. Villa appeared dead.

Perez decided to put Villa in the trunk of Escobar's car and take his body from the scene, "to try and avoid the consequences." He vaguely recalls a discussion about where to take the body, but he cannot remember the details.

Perez emphasized that it was his idea to place Villa's body in the trunk of Escobar's car. He is aware that she later testified that it was her idea, but he was greatly surprised by her statement. He believes that Escobar feels bad for him and testified it was her idea in order to help him in some way.

Perez admits placing Villa's call phone in the attic of his garage. He does not know why he did, explaining only that at the time he was "devastated."

Perez stated that he had no intention of harming or killing Villa. He simply wanted to confront Villa and Escobar and confirm his suspicions that they were together. He wanted to "catch them red handed."

Perez stated tearfully that Escobar was his first girlfriend and the only woman he had ever been with at the time.

Escobar had no knowledge that the events which unfolded were about to occur.


_____

**Stanley D. Cochran**
**Overwatch Assets Investigations**
**CA PI 28345**

# EXHIBIT B

Dorado & Dorado, APLC
Attorneys at Law
1030 Nevada Street
Suite 105
Redlands, CA 92374
909.307.2645
909.307.8035 Facsimile

In re: *response to request for information:*

November 7, 2016

To Whom It May Concern:

My name Christopher Dorado. I am a criminal defense attorney licensed to practice law in the state of California (SBN 264587).

On or about September 2014, I was engaged in jury trial in Lancaster California; the case was *People v. Melissa Escobar & Ryan Perez* [Codefendants in 1ˢᵗ degree murder charges]. In that criminal trial I represented Mrs. Melissa Escobar.

**Note:** The September 2014 trial was a *second* trial for Mrs. Escobar after a first trial ended in conviction for both Mrs. Escobar and Co-defendant, Ryan Perez. Mrs. Escobar's first conviction was successfully appealed with an order for new trial; Mr. Perez' conviction was affirmed and he appeared in Mrs. Escobar's second trial only as a witness for the prosecution.

On Wednesday, September 17, 2014, in the middle of Mrs. Escobar's second jury trial, I was informed that my twelve year old son, ███████████, was involved in a skateboarding accident while he was visiting with his mother in Riverside, California.

As of this writing I do not recall how far along Mrs. Escobar's trial had proceeded when I received information concerning my son's accident; however, I do remember that the case was well beyond jury selection and possibly beyond complete testimony of the prosecution's numerous witnesses.

Events of September 17, 2014:

On September 17, 2014, I returned to my hotel room in Lancaster after court recessed for the day. Sometime around 6:00 p.m. I turned on my cellular telephone to call my son's mother to say hello to my son. It was at that time that I learned of my son's accident. The very limited information I received from my son's mother was that ███████ *was in a very bad accident and that I should hurry to the hospital in Riverside'* [Paraphrasing]. I immediately left my hotel for Riverside, a distance of approximately seventy-five (75) miles.

While driving to Riverside I learned that ██████ had been transferred to Redlands Hospital and was being prepped for surgery. I do not recall the time that I arrived at Redlands Hospital. When I arrived at Redlands Hospital I saw my son for only a few seconds as he was being rushed to the emergency room. During ██████ surgery I learned that he had suffered a *subdural hematoma* as the result of a skateboarding accident.

I am not a medical doctor, but as I understood, the diagnosis for my son was as follows: ██████ *had fractured his skull during a skateboarding accident. During the fracturing of the skull, tiny skull fragments had severed blood vessels near his brain; blood was draining into his head between his brain and skull. The blood in the affected area caused pressure and required immediate surgery to 'release the pressure.' Without surgery,* ██████ *chances of surviving without severe brain injury were small.*

Surgery concluded several hours after it started. By morning, I was in court back in Lancaster and resuming defense of Mrs. Escobar. Several days later the trial concluded; Mrs. Escobar was found guilty.

As a trial attorney, I am used to the pressure of jury trials. In fact, the pressures of long criminal jury trials are sometimes defined by lawyers in terms of stressful, extremely emotional, or even physically challenging. Mrs. Escobar's second jury trial was certainly stressful, emotional, and physically challenging, and the news and events of my son's accident *could have* added to those pressures; however, I chose not to request a continuance of the trial.

<u>Choosing not to request a continuance of the jury trial.</u>

When I learned of my son's accident and diagnosis, nothing else was on mind or within my concern...nothing. September 17, 2014 was the longest and scariest day of my life; however, I chose not to request a continuance of Mrs. Escobar's trial for several reasons:

For one thing, in the early morning hours of September 18, 2016, I learned from doctors that ██████ was expected to make a full recovery after surgery. I also learned that ██████ was not expected to wake from surgery for about six hours and that he could take no visitors at that time. Therefore, I informed my son's mother, who was also at Redlands hospital in the patient visitor waiting room, that I would need to resume trial back in Lancaster in the morning but that I would return after court in the evening.

In other words, there was nothing for me to do at the hospital other than wait until the morning when ██████ would be awake and on his way to a full recovery.

Secondly, the prosecution had already gone over the time estimate for their *case in chief* and at least one member of the jury had mentioned, during voir dire, that he could not miss his previously scheduled vacation which was fast approaching on the calendar. The jury was time qualified for several weeks but the prosecution was moving inordinately slower than in the first trial. I felt defense was winning up to September 17, 2014, at least in terms of prosecution witness discrediting, and that a continuance could lose that particular jury.

In fact, even after the jury was released to deliberate the judge commented, off the record, that even he believed the jury was going to find Mrs. Escobar *not guilty (I mention this only to credit my own perception that the trial was going well for defense).* Thus, I did not want to risk losing the jury we had by requesting a continuance, especially when I felt emotionally returned to the state of mind necessary to defend Mrs. Escobar by the morning of September 18, 2014.

In sum, I believed that I was in the right state of mind to effectively defend Mrs. Escobar and that a continuance, without necessity, would adversely affect Mrs. Escobar.

*////*

*////*

<u>The objective and the subjective:</u>

*Subjectively*: By the morning of September 18, 2014 (resuming defense of Mrs. Escobar), I did not believe that I was still emotionally or physically impacted with the news and circumstance of my son's injury sufficient to necessitate a request for continuance. Of course, that is not to say that it was not heavily on mind during the remainder of the trial to one degree or another.

*Objectively*: I cannot say, with objective certainty, that the news and events surrounding my son's injury did not have an effect on my ability to properly represent Mrs. Escobar; I am only noting that I *subjectively* did not feel the traumatic event negatively affected my ability to defend Mrs. Escobar at the time.

My personal and professional experience is that traumatic news and events can affect a person in his or her ability to perform even ordinary tasks, much less conduct the proper defense of a defendant in a long and complex murder trial. I also know that sometimes people suffering from traumatic news or event cannot self-diagnose sufficient to observe the effects of that trauma. I will leave that possible diagnosis to the person or persons charged with making such arguments.

These are the facts as I recall them surrounding the events of September 14, 2014. I am always available for any questions.

Sincerely,

Christopher Dorado

EXHIBIT C



**Expert Report of Michael Iliescu, MD regarding the death of Miguel Villa**

September 07, 2017

**Introduction**

I have been asked to review autopsy reports, photographs, and expert witness testimonies related to the death of Miguel Villa. I have reviewed the case files to provide an opinion regarding the cause and nature of the injuries.

Information on this case is limited and it is this expert's understanding that, at this time, no other Medical Examiner's Office information and no new medical records are available for review. Therefore, the following summary, opinions, and conclusions are based on the information available at this time. I reserve the right to consider any new information that may become available at a later date and, if necessary, author an additional supplemental report. I was compensated for my review of these cases at a professional's hourly rate of $295/h.

**Summary of Qualifications**

My professional background is in forensic pathology and pathology of trauma.

My academic experience includes eight years of teaching in the area of forensic pathology and the pathology of trauma. I have performed more than 2,000 forensic autopsies throughout my eleven-year career in forensic pathology and have testified in criminal cases in County, State, and Federal courts in Arizona and Florida. Furthermore, I functioned as a full time medical examiner in Arizona for approximately four years and in Washington State for one year.

In the past four years, I have provided expert testimony in the following cases:

State of Arizona vs. Marjorie Orbin

State of Arizona vs. Shawnte Jones

State of Arizona vs. Filemon Marquez

State of Arizona vs. Carlos Anthony Barreras-Ratcliff (Deposition)

State vs. Sunderland (Pinal County)

State vs. Benny Gibson

The following material was reviewed:

- Autopsy Photos (pdf. format)
- Autopsy Report
- DA Closing Argument 1st and 2nd Trials
- Medical Examiner Testimony 1st and 2nd Trials

Review of the photographs taken during the autopsy examination show evidence of multiple blunt force injuries of Mr. Villa's head (paragraph I) and a contusion of the dorsal aspect of the right hand (paragraph II).

I.   **Blunt force injuries to the head.** There are multiple lacerations involving the forehead, the vertex of the scalp, and the left occipital and parietal scalp. These lacerations involve the full thickness of the scalp and they are accompanied by skin avulsions. These lacerations expose multiple comminuted fractures of the calvarium, focally exposing the brain matter. Some of the lines of fracture extend to the base of the skull and they are accompanied by subarachnoid and subdural hemorrhages and contusions of the brain. Also present are abrasions and contusions of the face.

I agree with the ME's statement that the injuries were not created by strikes with bare hands. The injuries to the scalp were induced by an object, like a baseball bat, crowbar or steel bar. This is because the scalp skin is very thick and multilayered, and multiple strikes with bare fists would not be able to create the scalp injuries seen in this case. The multi-layered scalp is depicted in Fig. 1 below. Multi-layered scalp skin is much thicker than the skin in other parts of the body, and is much more difficult to break. In addition to skin and subcutaneous tissue, the scalp shows three other layers not present in the skin elsewhere in the body: the epicranial aponeurosis (galea aponeurosis) and occipitofrontalis muscle, loose areolar tissue and pericranium (periosteum).



Figure 1. Multi-layered scalp is much thicker than the skin in other parts of the body, and it has three additional layers marked by red accolade).

Metal objects like baseball bats, crowbars or steel bars can create high-energy blows that lacerate the thick scalp skin and fracture the skull bone underneath it. Fig. 2 below shows an example of lacerations induced by a steel bar. Such linear lacerations are created by an object which has a linear appearance at the point of impact. This is most likely the type of blunt object which impacted repeatedly Mr. Villa's head, as shown in figure 4 below.



Figure 2. Multiple lacerations from a blunt steel bar. Note the slightly curved nature of the injury due to the curved shape of the skull.

The main reasons why this is not an injury created by brass knuckles are:

1. Brass knuckles have prominent convex areas which would leave a more scalloped laceration and not a linear or "Y" shaped laceration as seen in Mr. Villa's case. Composite Figure 3 below shows a photograph of brass knuckles and its multi-convex surface and an example of a brass knuckles injury from another forensic case.

 

| | |
|---|---|
| Composite figure 3. Brass knuckles with multiple convexities profile. | Much irregular, scalloped laceration induced by brass knuckles. |

2. Brass knuckles usually do not generate a forceful enough blow to create such devastating comminuted fractures of the skull as seen in Mr. Villa's autopsy photographs. In those very rare cases of high-energy blows with brass knuckles, the blunt object would also cause injuries of the assailant's fist had the blow been forceful enough to fracture a skull. No such injuries of defendant's hand were presented in the evidence material I reviewed.

3. I agree with Dr. Wang who in his second testimony (Bates 1539 and 1540), recognized that Villa's lacerations of the back of the head are more consistent with baseball bat than brass knuckles.

4. The medical examiner stated that the scalp lacerations were irregular. In reality, Mr. Villa's lacerations are linear in nature because the object which created them is linear. Multiple superimposed blows in the same general area of the head created multiple superimposed lacerations, accompanied by avulsed skin flaps, which resulted in the close proximity injuries which may appear irregular to some. Furthermore, some of the blows bounced off the skull, which resulted in the avulsed skin flaps lifted off of the vertex (depicted in Figure 5 below). The sketch in Figure 5 depicts multiple lacerations overlapping in different directions. These

same lifted up skin flaps also appear on the left occipital scalp. Close examination of the scalp laceration of Villa's left parietal region clearly show their linear appearance. The linear laceration of Mr. Villa's left scalp is documented in figure 4 below.  In his second testimony (Bates 1521), Dr. Wang recognized that Villa's skull fractures "were overlapping each other". This demonstrates that repeated, superimposed blows to the head occurred.



Figure 4. Multiple superimposed linear lacerations of Villa's scalp. The arrow points toward a linear laceration of left scalp.



Figure 5. Diagram of the vertex of the head injury from Dr. Wang's report.

5. Review of the bone injuries by an anthropologist of Mr. Villa would have shown the linear nature of the object which created this trauma (baseball bat, crowbar or steel bar for example). Apparently, the anthropological examination of the bones was not performed in this case. If injuries sustained by Mr. Villa were indeed created by brass knuckles, the multi-convexity profile of the brass knuckles would have shown individual fracture indentations on the bones examined, which are not described in the medical examiner's report in this case.

6. Comments regarding the blunt trauma to the left cheek. I was asked by the defense attorney to interpret Mr. Villa's left cheek injuries. During the closing argument, the following statement was made by the prosecution: "It may be the bat was used. But for sure, the brass knuckles were used." (7RT 4223:23-24.). The figure 6 below depicts the blunt trauma injuries to Mr. Villa's left cheek. There are more likely than not, at least two separate blows into this area. It is clearly visible that one contusion (highlighted by red oval) has a downward orientation. The contusions and abrasions marked by the blue oval represent the second blow with a different, more horizontal, orientation. The left cheek injuries are lacking the evenly spaced contusions with focal point of impact expected to be seen in brass knuckles injuries. In my best professional opinion, I cannot make a conclusion as to the cause of these injuries based on the photographs provided. This is because any blunt object could have generated these injuries and I don't see any clear pattern consistent with one blunt object or another.



Figure 6. Blunt force injuries on Mr. Villa's left cheek show at least two different blows. The red oval is pointing out the overall orientation of blow #1 and the blue oval is pointing out the orientation of blow #2.

II.    **Contusion of the dorsal aspect of Mr. Villa's right hand.** Mr. Villa's right hand shows a contusion which could represent either offensive or defensive injuries. The medical examiner stated that the wounds were likely defensive in nature, but in reality, both scenarios are a possibility.

**CONCLUSION**

It is more likely than not that the head injuries sustained by Mr. Villa are the result of repeated high-energy blows to the head with a blunt object like baseball bat, crowbar or steel bar. It is less likely that the blunt trauma to Mr. Villa's head was produced by brass knuckles.

Michael Iliescu, MD

Melissa Escobar
_____
*Petitioner*

Molly Hill, Warden California Institution for Women
_____
*Respondent(s)*

**DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
*IN FORMA PAUPERIS***

I, __Melissa Escobar_____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?  ☐ Yes  ☒ No

   a. If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. ____N/A_____

   b. If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. *(7:01)* Redlands Unified School District (2011)  / # 12.50

2. Have you received, within the past twelve months, any money from any of the following sources?
   a. Business, profession or form of self-employment?       ☐ Yes  ☒ No
   b. Rent payments, interest or dividends?                   ☐ Yes  ☒ No
   c. Pensions, annuities or life insurance payments?         ☐ Yes  ☒ No
   d. Gifts or inheritances?                                  ☐ Yes  ☒ No
   e. Any other sources?                                      ☐ Yes  ☒ No

   If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: ___N/A_____

3. Do you own any cash, or do you have money in a checking or savings account?  *(Include any funds in prison accounts)*

   ☐ Yes  ☒ No

If the answer is yes, state the total value of the items owned: _N/A_____

_____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes  ☑ No

   If the answer is yes, describe the property and state its approximate value: _____

   _____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: _N/A_____

   _____

   _____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on ___09-18-2019___        _____
              Date                              Signature of Petitioner

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $ _0 00_____ on account to his credit at the _CALIFORNIA INST. FOR WOMEN_____ institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: _____

_____

_10/3/19_____        _C/O  TAPIA_____
      Date                              Authorized Officer of Institution/Title of Officer



Melissa Escobar # IVE4437
6758 Union Corks Blvd
Corona, Ca. 92880

CN

OCT 1 1 2019

United States Courthouse
255 East Temple St. suite TS-134
Los Angeles, Ca.
90012

LEGAL
MAIL

'2

74/8/

10/8/9